UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| GEORGE JOHNSON, | CASE NO. C16-1738JLR |
| Plaintiff, | FINDINGS OF FACT AND CONCLUSIONS OF LAW |
| v. | |
| DONALD P. WANG, et al., | |
| Defendants. | |

## I.  INTRODUCTION

This matter came for trial on August 13-14, 2018, before the court sitting without a jury.  (*See* 8/13/18 Min. Entry (Dkt. # 56); 8/14/18 Min. Entry (Dkt. # 57); 8/13/18 Tr. Trans. (Dkt. # 58) (sealed); 8/14/18 Tr. Trans. (Dkt. # 59) (sealed).)  Plaintiff George Johnson was represented at trial by Neil Thomas Lindquist and John W. Merriman.  Defendant Donald P. Wang proceeded *pro se* at trial.  The court also permitted the parties to file post-trial briefing concerning damages.  (*See* Johnson Br. (Dkt. # 60); Wang Br. (Dkt. # 61); Wang Errata (Dkt. # 62).)  The court has considered the testimony presented

at trial, the exhibits admitted into evidence, properly filed post-trial memoranda and declarations, and the arguments of counsel and Mr. Wang.  The court has weighed the testimony of witnesses, the exhibits, and other evidence using the required "preponderance of the evidence" standard.  Being fully advised, and pursuant to Federal Rule of Civil Procedure 52(a), the court makes the following findings of fact and conclusions of law.[1]

## II.    FINDINGS OF FACT

**A.    The Parties**

1.    Mr. Johnson resides in Seattle, Washington.  (8/13/18 Tr. Trans. at 5:8-10; Compl. (Dkt. # 1) ¶ 2; Answer (Dkt. # 13) ¶ 2.)  He has been a commercial fisherman for 63 years—since he graduated high school in 1955.  (8/13/18 Tr. Trans. at 6:1-2.)

2.    Mr. Wang resides in Los Angeles, California.  (Tr. Ex. 7 ("Wang Dep.") at 18:6-14.)  He purchased the F/V Thor on July 12, 2016, for $25,000.00.  (Pretrial Order (Dkt. # 45) at 2 (Admitted Fact No. 2); Wang Dep. at 12:14-17, 12:25-13:4.)

3.    *In rem* Defendant, F/V Thor, her engines, machinery, appurtenances, and cargo ("F/V Thor"), Official Number 224713, is a 62-foot wooden halibut schooner of 70 gross tons.  (Pretrial Order at 2 (Admitted Fact. No. 1); Tr. Ex. 1; Tr. Ex. 2.)  F/V Thor was built in 1925, in Tacoma, Washington.  (Pretrial Order at 2 (Admitted Fact No. 1);

*//*

---

[1] To the extent any of the court's findings of fact may be deemed conclusions of law, they shall also be considered conclusions of law.  Similarly, to the extent any of the court's conclusions of law may be deemed findings of fact, they shall also be considered findings of fact.  *See In re Bubble Up Del., Inc.*, 684 F.2d 1259, 1262 (9th Cir. 1982).

Tr. Ex. 1; Tr. Ex. 2.)

**B.    Credibility Determinations**

4.    The court finds that, although Mr. Johnson is the plaintiff in this action, and therefore, by definition, is an interested party, his testimony is credible.

5.    The court finds that Port of Seattle Police Officer Matthew Huston has no stake in the outcome of this litigation, and his testimony is credible.

6.    The court finds that, although Frank David Price, Jr., has worked for Mr. Johnson in the past and attempted to enter into at least one business deal in the past with Mr. Wang, he has no stake in the outcome of this litigation, and his testimony is credible.

7.    The court finds that, although Elwood Ramsey Latta has worked for both Mr. Johnson and Mr. Wang in the past, and although he had to obtain a judgment against Mr. Wang in order to receive his wages from Mr. Wang, he has no stake in the outcome of this litigation, and his testimony is credible.

8.    The court finds that Tom E. Riedinger has no stake in the outcome of this litigation, and his testimony is credible.

9.    The court finds that Mr. Wang's testimony lacks credibility. First, Mr. Wang provided inconsistent testimony in response to Mr. Johnson's motion for summary judgment. *See Johnson v. Wang*, No. C16-1738JLR, 2017 WL 4957799, at *5 (W.D. Wash. Oct. 31. 2017) ("The court is mindful of the inconsistencies in Mr. Wang's testimony.").

10.    In addition, Mr. Wang's trial testimony conflicts with his deposition testimony in several respects. For example, in his deposition, Mr. Wang testified that Mr.

Johnson was on the F/V Thor for the purpose of evaluating the vessel "[f]or going

fishing." (Wang Dep. at 22:8-13.) Yet, at trial Mr. Wang testified that he had not asked

Mr. Johnson to evaluate the F/V Thor, did not know why Mr. Johnson had performed an

evaluation of the F/V Thor, and had not seen him perform such an evaluation. (8/14/18

Tr. Trans. at 149:1-8.)

       11.    Mr. Wang also testified in his deposition that he did not know if Mr.

Johnson had ever worked on the F/V Thor. (Wang Dep. at 20:25-30:6.) However, at

trial, Mr. Wang testified that Mr. Johnson had worked on the F/V Thor, including

replacing tanks, replacing a wooden table, and replacing a step or steps. (8/14/18 Tr.

Trans. at 131:3-13.)

       12.    During his deposition, Mr. Wang testified that the F/V Thor was ready to

go tuna fishing and did not need anything at the time he purchased it. (Wang Dep. at

23:18-24:8, 26:9-11, 36:6-7.) However, Mr. Wang testified at trial that part of his

discussions with Mr. Johnson included Mr. Johnson "getting the boat ready to go

fishing." (8/14/18 Tr. Trans. at 129:15-22.) Mr. Wang also testified at trial that the F/V

Thor needed safety gear including a life raft and survival suits, which he supplied. (*Id.* at

135:2-4, 138:6-8, 140:22-141:7.)

       13.    During his deposition, Mr. Wang testified that he could not recall if he had

asked Mr. Johnson to find a crew for the F/V Thor. (Wang Dep. at 29:11-14.) However,

at trial Mr. Wang testified that he discussed leasing the F/V Thor to Mr. Johnson

provided that Mr. Johnson supply a crew for the vessel. (8/14/18 Tr. Trans. at 129:20-22,

130:22-24; *see id.* at 133:21-24.)

14.     Finally, Mr. Wang's cross examination during trial ended with the

following exchange:

> **Q:**  Mr. Wang, were you telling the truth then, or are you telling the truth
> now?
> **A:**  "Then" meaning exactly when?
> **Q:**  During your deposition, Mr. Wang.
> **A:**  Hard to say.

(*Id.* at 149:16-20.)  In this one respect, the court finds Mr. Wang's testimony to be

credible—it is hard to say when Mr. Wang was telling the truth.  The remainder of his

testimony, however, is not credible.  Thus, to the extent that Mr. Wang's testimony

conflicts with the testimony of other witnesses, the court credits the testimony of the

other witnesses, rather than Mr. Wang's testimony.

**C.    Mr. Johnson's and Mr. Wang's Initial Oral Agreement Concerning the F/V Thor**

15.     In mid-June of 2016, Mr. Wang informed Mr. Johnson that he was

interested in buying the F/V Thor to go albacore tuna fishing.  (8/13/18 Tr. Trans. at

9:15-23.)  Mr. Wang asked Mr. Johnson to evaluate the boat for him.  (*Id.* at 9:23.)  Mr.

Wang told Mr. Johnson that, if he decided to purchase the F/V Thor, he would hire Mr.

Johnson to get the boat ready for fishing, and then once the boat was ready, Mr. Johnson

could serve as the captain of the vessel for the 2016 tuna fishing season.  (*Id.* at 9:24-

10:1, 11:2-6, 12:21-23.)

16.     Mr. Johnson and Mr. Wang agreed that Mr. Johnson would work for

$15.00/hour to get the boat ready for tuna fishing and that he would keep a log of his

1  time. (*Id.* at 11:9-18.)  Mr. Wang agreed to pay Mr. Johnson for his time getting the boat

2  ready for the tuna fishing season when the work was complete and the boat was ready to

3  go fishing. (*Id.* at 35:5-6, 54:22-55:2, 67:3-8.)

4  17.  Mr. Johnson and Mr. Wang agreed that 60% of the proceeds from the 2016

5  fishing season would go to the boat or Mr. Wang—as the owner—and 40% of the

6  proceeds would go to the captain and crew. (*Id.* at 55:13-17; 56:11-14; 8/14/18 Tr.

7  Trans. at 138:18-139:1.)  Mr. Johnson, as the captain, would retain a 20% share, and the

8  two crew members would each receive a 10% share. (8/13/18 Tr. Trans. at 56:17-19.)

9  18.  Mr. Johnson agreed to work for only $15.00/hour preparing the F/V Thor

10  for the 2016 fishing season because Mr. Wang promised to hire him as the skipper of the

11  vessel once the work was complete. (*Id.* at 11:21-22, 54:17-21, 61:2-5.)  The fair market

12  value for the labor Mr. Johnson performed getting the F/V Thor ready for the fishing

13  season is $45.00/hour. (*Id.* at 12:18-20.)

14  19.  Mr. Wang and Mr. Johnson did not reduce their agreement to writing; they

15  did not have a written contract. (*Id.* at 12:24-31:1, 41:9-12.)

16  20.  Mr. Wang testified at trial that he and Mr. Johnson did not reduce their

17  agreement to writing because they never agreed on how the fuel costs for the fishing

18  season should be allocated. (8/14/18 Tr. Trans. at 129:23-30:2; *see also id.* at

19  129:23-130:2, 133:8-20; 134:12-13.)  However, Mr. Johnson testified that there was no

20  dispute or "discrepancy" between the parties and they agreed that the expenses for the

21  //

22  //

fishing season, including fuel costs, would come out of Mr. Wang's 60% of the catch.[2]

As stated above, to the extent that Mr. Wang's testimony contradicts Mr. Johnson's

testimony on this point, the court credits Mr. Johnson's testimony and finds that the

parties had agreed that expenses for the fishing season, including fuel costs, were to come

out of the Mr. Wang's 60% of the gross proceeds from the season's catch.

**D.    Mr. Johnson's Work Aboard the F/V Thor**

21.    Mr. Johnson inspected the F/V Thor on behalf of Mr. Wang.  (8/13/18 Tr.

Trans. at 14:25-15:17.)  Mr. Johnson reported to Mr. Wang that it was going to cost

approximately $20,000.00 to get the F/V Thor ready to go out tuna fishing and to be

brought up to United States Coast Guard requirements.  (*Id.* at 15:19-25.)

22.    Mr. Wang asked Mr. Johnson to use the information Mr. Johnson obtained

as a result of his inspection of the F/V Thor to assist Mr. Wang in his negotiations to

purchase the F/V Thor.  (*Id.* at 16:3-10.)  Mr. Johnson was able to negotiate on behalf of

Mr. Wang a $10,000.00 reduction in the F/V Thor's purchase price—from $35,000.00 to

$25,000.00.  (*Id.*)

---

[2] Specifically, Mr. Johnson testified on cross-examination conducted by Mr. Wang:

**Q:**  Do you recall another discrepancy between the two of us regarding fuel costs?
**A:**  Not a discrepancy between the two of us.  A 60/40 split we talked about.  The
boat pays the expenses and the crew gets a flat percentage, and the expenses are
built into that, as is the captain's deal.
**Q:**  Which part of the 60 or 40 pays for the fuel?
**A:**  The fuel comes out of the 60 percent.  The standard deal would be the skipper
gets 20 percent, the two experienced crew members would get 10 percent each, of
the gross sales.

(8/13/18 Tr. Trans. at 56:9-19.)

23.     Although the sale of the F/V Thor to Mr. Wang was not complete until July 19, 2016, Mr. Johnson began to work on the vessel to get it ready for the tuna fishing season on June 20, 2016, at Mr. Wang's direction, for Mr. Wang's benefit, and with the permission of the vessel's owners at that time.  (*Id.* at 17:23-18:16, 40:14-41:8, 81:6-19, 82:82:8-13, 82:23-83:2; Tr. Ex. 1.)

24.     Mr. Johnson supervised two other crew members who were also working on the F/V Thor during the summer of 2016:  Alex Oldfin and Aaron Vantleven.  (8/13/18 Tr. Trans. at 18:17-19:15.)  Mr. Wang and Mr. Johnson hired these two crew members together by mutual agreement.  (*Id.* at 19:3-9.)  Mr. Wang was responsible for paying the crew.  (*Id.* at 22:11-14.)  Mr. Vantleven lived aboard the F/V Thor while he was working for the vessel's previous owner and continued to do so once he was working under Mr. Johnson's supervision.  (*Id.* at 19:19-20:5.)

25.     Between June 20, 2016, and September 2, 2016, Mr. Johnson worked a total of 492 hours preparing the F/V Thor for the fishing season.  (8/13/18 Tr. Trans. at 33:17-18, 34:2-3; *see* Tr. Ex. 5.)  By September 2, 2018, Mr. Johnson had completed his work and the F/V Thor "was ready to go fishing," and Mr. Johnson was prepared and willing to skipper the vessel for the 2016 tuna fishing season.  (8/13/18 Tr. Trans. at 33:18-34:1.)

26.     Mr. Johnson kept a contemporaneous log of the time he spent working on the F/V Thor to get the vessel ready for the 2016 tuna fishing season.  (*Id.* at 13:19-14:19, 81:22-25; Tr. Ex. 5.)  Mr. Johnson provided a copy of the log to Mr. Wang.  (8/13/18 Tr. Trans. at 37:2-7.)

27. Mr. Johnson also prepared a partial list of the tasks that he and the two other crew members performed on the F/V Thor in order to prepare the vessel for the 2016 fishing season. (*Id.* at 20:18-21:17.) Mr. Johnson's partial list of tasks was compiled after all the work was completed. (*Id.* at 42:24-43:2.) The work Mr. Johnson performed on the vessel included replacing tanks, replacing a wooden table, and replacing some steps. (8/14/18 Tr. Trans. at 131:11-13.)

28. Mr. Wang paid for the equipment and materials that Mr. Johnson needed on board the F/V Thor. (8/13/18 Tr. Trans. at 23:16-22.) Mr. Wang was aboard the F/V Thor several times while Mr. Johnson was working there. (*Id.* at 23:11-25:6.) Mr. Wang helped as a deckhand once when Mr. Johnson needed to move the F/V Thor to the pump out float at the marina. (*Id.* at 23:11-15.) Mr. Wang was present when Mr. Johnson installed equipment, such as the tuna pullers, and Mr. Wang inspected the equipment that Mr. Johnson installed. (*Id.* at 24:10-17.) Mr. Wang was in the engine room more than ten times while Mr. Johnson was working on the F/V Thor. (*Id.* 24:18-25:7.) Mr. Wang also authorized Mr. Johnson to remove equipment from Mr. Wang's other boat—the F/V Alma—and install it on the F/V Thor. (*Id.* at 25:8-21.) Mr. Johnson obtained tuna pullers, fishing gear, tools, and other odds and ends from the F/V Alma to place on the F/V Thor with Mr. Wang's consent. (*Id.*)

E.     **The Events of July 23-24, 2016**

29. On July 23, 2016, Mr. Johnson called Mr. Wang because one of the crew members was "very upset" because Mr. Wang had not paid the crew member for his work on the F/V Thor. (*Id.* at 50:8-20.) Mr. Johnson was concerned about Mr. Wang's

safety because the crew member indicated that he was going to confront Mr. Wang about

the issue.  (*Id.*)  Mr. Wang and the crew member subsequently argued over the wage

issue, and Mr. Wang called the Seattle Police Department ("SPD").  (*Id.*)

30.     Mr. Wang reported to SPD that Mr. Vantleven was harassing his

coworkers.  (*Id.* at 71:21-22; Tr. Ex. 8.)  When Officer Matthew Huston arrived at the

F/V Thor on July 23, 2018, Mr. Wang was at the vessel, but Mr. Vanleven was not there.

(8/13/18 Tr. Trans. at 73:7-23.)  Officer Huston telephoned Mr. Vantleven and told him

that he needed to retrieve his belongings from the F/V Thor and, if he continued to go

onto the vessel after retrieving his belongings, he would be cited for criminal trespass.

(*Id.* at 72:22-25; Tr. Ex. 8.)

31.     On the morning of July 24, 2016, Mr. Johnson was on the F/V Thor when

SPD officers arrived once again.  (8/13/18 Tr. Trans. at 25:22-26:15; Tr. Ex. 8.)  The

SPD officers were at the vessel at the request of Mr. Wang to perform a "civil standby" to

ensure the peace while both Mr. Vantleven and Mr. Oldfin retrieved their possessions

from the boat.  (8/13/18 Tr. Trans. at 25:22-26:15, 73:3-10.)

32.     Mr. Johnson asked Mr. Wang why he was kicking the crew off the vessel.

(*Id.* at 26:7-15.)  Mr. Wang told Mr. Johnson that the crew members had asked him for

money, but he was not satisfied with their work and so he had fired them.  (*Id.*)  This was

the first time that Mr. Johnson had heard that Mr. Wang was dissatisfied with the crew's

work.  (*Id.*)

33.     Mr. Johnson asked Mr. Wang if he wanted Mr. Johnson to vacate the F/V

Thor as well.  (*Id.* at 26:16-21.)  Mr. Wang said that he did not want Mr. Johnson to leave

because—although he intended to replace the two fired crew members with Mexicans who he would bring to Seattle from the Los Angeles area—he needed a United States captain to run the boat. (*Id.*)

34. Mr. Johnson interviewed prospective crew members who lived in the Seattle area to replace Mr. Vantleven and Mr. Oldfin, but none were willing to work for the substandard wages that Mr. Wang was then offering. (*Id.* at 28:13-21.)

**F.     The End of Mr. Johnson's Employment with Mr. Wang**

35. The last day that Mr. Johnson worked aboard the F/V Thor was on September 2, 2016. (*Id.* at 33:17-18.)

36. By the time Mr. Johnson stopped working for Mr. Wang, the F/V Thor was properly outfitted and prepared to go tuna fishing. (*Id.* at 33:19-23.) The F/V Thor needed fuel, groceries, and a crew, but it needed no more repairs. (*Id.*) The vessel was ready to go fishing. (*Id.*)

37. When Mr. Johnson told Mr. Wang that the F/V Thor was ready to go tuna fishing, Mr. Wang informed Mr. Johnson that he intended to sell the F/V Thor instead of sending it to fish tuna that season. (*Id.* at 34:7-17.) Further, Mr. Wang told Mr. Johnson to get off the vessel and to remove all his belongings. (*Id.* at 34:18-20, 61:6-10.)

38. When Mr. Wang informed Mr. Johnson that he intended to sell the F/V Thor, Mr. Johnson asked to be paid for his work aboard the vessel, but Mr. Wang refused. (*Id.* at 34:20-23, 66:1-7.) Mr. Wang has never paid Mr. Johnson for any of Mr. Johnson's work on the F/V Thor. (*Id.* at 35:2-11.) Indeed, Mr. Wang told Mr. Johnson

//

that he was "dead wood, an old man," and that Mr. Johnson would be "dead before [Mr. Wang] paid him a dime." (*Id.* at 25:7-11.)

39.     Mr. Wang's refusal to pay Mr. Johnson the hourly wages he owed to Mr. Johnson for Mr. Johnson's work aboard the F/V Thor was intentionally dishonest, recalcitrant, and done in bad faith.

### III.     CONCLUSIONS OF LAW

**A.     Jurisdiction**

1.     The court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1333 because this dispute concerns repair work performed on a commercial fishing vessel to make the vessel ready for the upcoming tuna fishing season. *See Owens-Illinois, Inc. v. U.S. Dist. Court for W. Dist. of Wash., at Tacoma,* 698 F.2d 967, 970 (9th Cir. 1983) ("Where a contract relates to the repair or navigation of a vessel, a dispute arising from the contract lies within admiralty jurisdiction.").

**B.     The Oral Contract**

2.     "When a contract is a maritime contract and the dispute is not inherently local, federal law controls basic contract interpretation." *Crowley Marine Serv., Inc. v. Vigor Marine LLC*, 17 F. Supp. 3d 1091, 1094 (W.D. Wash. 2014) (citing *N. Pac. S.S. Co. v. Hall Bros. Marine R. & Shipbuilding Co.*, 249 U.S. 119, 128 (1919)); *see also Royal Ins. Co. of Am. v. Pier 39 Ltd. P'ship*, 738 F.2d 1035, 1036 (9th Cir. 1984) (citing *Ins. Co. v. Dunham*, 78 U.S. 1, 26 (1871)) ("A contract falls within the court's admiralty jurisdiction "if [the contract"] subject matter is maritime."). "Basic principles in the common law of contracts readily apply in the maritime context." *Clevo Co. v. Hecny*

*Transp., Inc.*, 715 F.3d 1189, 1194 (9th Cir. 2013).

3.      During mid-June 2016, Mr. Johnson and Mr. Wang formed an oral contract, which contained the following terms:  Mr. Johnson agreed to work on the F/V Thor for $15.00/hour to prepare the vessel for the upcoming tuna fishing season.  Mr. Johnson and Mr. Wang agreed that Mr. Wang would pay Mr. Johnson for his time getting the F/V Thor ready for the season when the vessel was ready to go fishing.  Mr. Johnson also agreed to serve as captain of the F/V Thor during the tuna fishing season.  In exchange for his services as captain, Mr. Wang promised Mr. Johnson a 40% share of the gross sales of any catch.  Mr. Johnson was to pay two crew members shares of 10% each out of his 40% share, and Mr. Johnson would retain a 20% share of the gross sales of any catch.  Mr. Wang, as the owner of the F/V Thor, was to receive 60% of the gross sales of any catch.  The expenses for the vessel, including fuel for the 2016 fishing season, were to come out of Mr. Wang's 60% share.

4.      Mr. Wang breached his oral contract with Mr. Johnson when he refused to pay Mr. Johnson for the 492 hours of work that Mr. Johnson performed on the F/V Thor getting the vessel ready for the 2016 tuna fishing season.  Mr. Wang also breached his oral contract with Mr. Johnson when he refused to allow Mr. Johnson to take the F/V Thor tuna fishing during the 2016 season and instead decided to put the vessel up for sale.

**C.    Application of Admiralty Statutes**

5.      "[L]egislation for the benefit of seamen is to be construed liberally in their

//

favor." *McMahon v. United States*, 342 U.S. 25, 27 (1951).

6.      Section 10601 of Title 46 requires contracts between working fishermen and those who own the vessel to be in writing.  *See* 46 U.S.C. § 10601; *see also Gruver v. Lesman Fisheries, Inc.*, 409 F. Supp. 2d 1263, 1265 (W.D. Wash. 2005) ("Section 10601(a) requires that agreements with seamen be in writing; a master who hires a seaman on an oral contract violates that law . . . .").

7.      Section 10601 "specifically includes lay share fisherman by providing that '[t]he agreement shall . . . include the terms of *any wage, share, or other compensation arrangement* particular to the fishery in which the vessel will be engaged.'"  *Doyle v. Huntress, Inc.*, 419 F.3d 3, 14 (1st Cir. 2005) (quoting 46 U.S.C. § 10601(c)(2), which is now redesignated as 46 U.S.C. § 10601(b)(3)) (italics in original).  Section 10601 also provides that the written agreement shall "state the period of effectiveness of the agreement" and "include other agreed terms."  46 U.S.C. §§ 10601(b)(1), (b)(3).  Thus, the contract between Mr. Wang and Mr. Johnson fell within the purview of 46 U.S.C. § 10601 and was required to be in writing.

8.      Mr. Wang's failure to reduce his oral agreement with Mr. Johnson to writing was a violation of 46 U.S.C. § 10601, and the oral contract was, therefore, contrary to law.  *See Doyle v. Huntress, Inc.*, 301 F. Supp. 2d 135, 144 (D.R.I. 2004), *aff'd*, 419 F.3d 3 (1st Cir. 2005) ("By definition, oral agreements do not satisfy the statute, as § 10601 requires Defendants to have written agreements with their crew

//

//

members.").

9.     Section 11107 of Title 46 provides, in pertinent part:

An engagement of a seaman contrary to a law of the United States is void. A seaman so engaged . . . is entitled to recover the highest rate of wages at the port from which the seaman was engaged or the amount agreed to be given the seaman at the time of engagement, whichever is higher.

46 U.S.C. § 11107.  "The most natural reading of the term 'seaman' in § 11107 is that 'seaman' encompasses lay share fishermen."  *Doyle*, 419 F.3d at 14.

10.     Reading 46 U.S.C. § 11107 together with 46 U.S.C. § 10601, the "highest rate of wages" provision of § 11107 provides a cause of action available to lay share fishermen against vessel owners when their contracts are contrary to law—such as the oral employment contract between Mr. Wang and Mr. Johnson.  *See Flores v. Am. Seafoods Co.*, 335 F.3d 904, 912 (9th Cir. 2003) (stating that an agreement that violates the requirements of § 10601 "will trigger the application of 46 U.S.C. § 11107"); *Seattle-First Nat'l Bank v. Conaway*, 98 F.3d 1195, 1198 (9th Cir. 1996) ("[Section] 11107 provides for a penalty against vessel owners who employ seamen without written agreements in violation of §10601."); *Gruver*, 409 F. Supp. 2d at 1265 ("[A] master who hires a seaman on an oral contract violates [46 U.S.C. § 10601], and the seaman is therefore entitled to the remedies set forth in § 11107.").

11.     The Ninth Circuit has interpreted the term "highest rate of wages" as "entitl[ing] the wronged seaman to recover either his promised wages or the highest rate of wages of a seaman of comparable rating at the port from which he was engaged, whichever is higher."  *TCW Special Credits v. Chloe Z Fishing Co.*, 129 F.3d 1330, 1334

1    (9th Cir. 1997).  In other words, the provision provides "a statutory default to [the]

2    prevailing market wage in the case of an invalid contract."  *Harper v. U.S. Safoods LP*,

3    278 F.3d 971, 977 (9th Cir. 2002).

4         12.    Because the oral contract between Mr. Wang and Mr. Johnson was contrary

5    to law, Mr. Johnson is entitled to either his promised wages or the prevailing market

6    wage, whichever is higher, for his work aboard the F/V Thor.  *See* 46 U.S.C. §§ 10601,

7    11107; *TCW Special Credits*, 129 F.3d at 1334; *see also Harper*, 278 F.3d at 977.

8    Although Mr. Wang promised Mr. Johnson a rate of $15.00/hour for his work on the F/V

9    Thor (8/13/18 Tr. Trans. at 11:9-18), the fair market value for the labor Mr. Johnson

10   performed is $45.00/hour (*id.* at 12:18-20).  Pursuant to 46 U.S.C. § 11107, Mr. Johnson

11   is entitled to $45.00/hour for the 492 hours of work on the F/V Thor for which Mr. Wang

12   failed to compensate him.  The total amount of wages that Mr. Johnson is entitled to

13   recover from Mr. Wang, therefore, is $22,140.00.[3]

14   //

15   //

16   //

17   //

---

18   [3] Mr. Johnson makes no claim for damages arising out of Mr. Wang's breach of the
     portion of their oral contract related to Mr. Johnson's agreement to serve as captain of the F/V

19   Thor for the 2016 tuna fishing season in exchange for a share of the catch.  (*See generally*
     Compl. (Dkt. # 1).)  In any event, any calculation of damages based on Mr. Johnson's loss of a

20   share of the catch would be too speculative to award.  *See Putnam v. Lower*, 236 F.2d 561, 571
     (9th Cir. 1956) ("[P]rospective profits from a fishing lay are too speculative and uncertain to be a

21   proper measure of damages," except "where there is an established going business" or some
     other "yardstick of prior profits."); (*see also* Johnson Tr. Br. (Dkt. # 52) at 9 ("[D]amages from

22   [Mr.] Johnson's lost opportunity to fish tuna in 2016 are too speculative in nature to
     enforce . . . .").)

**D.      Wage Penalty under RCW 49.52.070**

13.      Mr. Johnson seeks an award of penalties pursuant to Washington State's wage laws.[4]  (*See* Johnson Br. at 2-4.)  Washington law provides that an employer who willfully and intentionally deprives his employee of the employee's rightful wages in violation of RCW 49.52.050[5] shall be liable for twice the withheld amount.  *See* RCW 49.52.070.

14.      Before applying RCW 49.52.070, the court must determine if federal law preempts RCW 49.52.070.  Federal law preempts state law if (1) Congress expressly so states, (2) Congress enacts comprehensive laws that leave no room for additional state regulation, or (3) state law actually conflicts with federal law.  *Pac. Merch. Shipping Ass'n v. Aubry*, 918 F.2d 1409, 1415 (9th Cir. 1990).  As a general rule, states may supplement federal admiralty law as applied to matters of local concern, so long as state law does not actually conflict with federal law or interfere with the uniform working of the maritime legal system.  *Id.* at 1422.

//

//

---

[4] Mr. Johnson seeks punitive damages only in the alternative to the penalty available under Washington's wage laws.  (*See* Johnson Br. at 4-5.)  Because the court awards Mr. Johnson a recovery under RCW 49.52.070, it does not consider Mr. Johnson's claim for punitive damages.

[5] In pertinent part, RCW 49.52.050 provides:

> Any employer . . . who . . . [w]illfully and with intent to deprive the employee of any part of his or her wages, shall pay any employee a lower wage than the wage such an employer is obligated to pay such employee by any statute, ordinance, or contract . . . [s]hall be guilty of a misdeamor.

RCW 49.52.050(2).

15.     "[Section 11107 of Title 46] does not expressly preempt state law."

*Gruver*, 409 F. Supp. 2d at 1265 (citing 46 U.S.C § 11107).

16.     RCW 49.52.070 does not conflict with 47 U.S.C § 11107, but "merely

provides an additional remedy for wages that have been wrongfully withheld."  *Gruver*,

409 F. Supp. 2d at 1265.  Further, RCW 49.52.070 merely supplements and "does not

interfere with the uniform working of the maritime legal system."  *Id.*; *Chirrick v. F/V*

*SHARON LORRAINE*, No. C95-936D, 1996 WL 263242, at *2 (W.D. Wash. Jan. 24,

1996) (citing *Greene v. Pac. King Fisheries, Inc.*, No. C92-1985Z, 1993 WL 565333, at

*4 (W.D. Wash. Jan. 14, 1993)).

17.     Courts have described both 46 U.S.C. § 11107 and RCW 49.52.070 as

penalties.  *See, e.g.*, *Seattle-First Nat'l Bank v. Conaway*, 98 F.3d 1195, 1198 (9th Cir.

1996) ("[Section] 11107 provides for a penalty against vessel owners who employ

seamen without written agreements in violation of § 10601.");  *Morgan v. Kingen*, 210

P.3d 995, 996 (Wash. 2009), as corrected (Nov. 9, 2009) ("RCW 49.52.070 . . . set[s] out

the criminal and civil penalty mandated where any employer . . . willfully and with intent

deprives the employee of any part of his or her wages.").  Yet, Section 11107 is "better

characterized as merely providing a statutory default to prevailing market wage in the

case of an invalid contract."  *Harper v. U.S. Seafoods LP*, 278 F.3d 971, 977 (9th Cir.

2002).  Rather than being punitive, the remedy provided by 46 U.S.C. § 11107 "merely

gives what is due."  *Seattle-First Nat. Bank v. LADY LYNNE, Off. No. 95887*, No.

A92-0633 CIV (HRH), 1995 WL 464536, at *5 n.10 (D. Alaska Apr. 17, 1995), *aff'd sub*

*nom. Seattle-First Nat. Bank v. Conaway*, 98 F.3d 1195 (9th Cir. 1996) (viewing 46

U.S.C. § 11107 as "remedial" rather than "punitive"). Thus, 46 U.S.C. § 11107 leaves

room for the court to award the wage that "is due," as well as a penalty under RCW

49.52.070, if warranted. *See Pac. Merch. Shipping Ass'n*, 918 F.2d at 1415 (stating that

federal law preempts state law if federal law leaves no room for additional state

regulation).

18.     Moreover, both Washington State and the federal government have an

interest in seeing that employees are paid wages that are due. *Gruver*, 409 F. Supp. 2d at

1265; *Chirrick*, 1996 WL 263242, at *2 (citing *Greene*, 1993 WL 565333, at *3).

19.     Further, Washington has a local interest in ensuring that employers who do

business in Washington comply with state wage laws in paying their Washington

employees. *See Gruver*, 409 F. Supp. 2d at 1265; *Chirrick*, 1996 WL 263242, at *2;

*Greene*, 1993 WL 565333, at * 3 (stating that "Washington has an interest in ensuring

that corporations that do business in the state comply with state wage laws" and that the

state's interest would be even greater if the seamen involved were Washington residents).

20.     Accordingly, the court concludes that the doubling of wages under RCW

49.52.070 is not preempted by federal maritime law in the context of this case. *See*

*Gruver*, 409 F. Supp. 2d at 1265-66; *Chirick*, 1996 WL 263242, at *2 (citing *Greene*,

1993 WL 565333, at *2-4).

21.     Mr. Wang willfully and intentionally deprived his employee, Mr. Johnson,

of his rightful wages in violation of RCW 49.52.050. *See supra* § II.F. Accordingly, Mr.

Wang is liable to Mr. Johnson for twice the withheld amount. *See* RCW 49.52.070.

*//*

22.     Mr. Wang willfully and intentionally withheld $22,140.00 in wages from Mr. Johnson.  *See supra* § III.C.  Accordingly, under RCW 49.52.070, Mr. Johnson is entitled to recover a total of $44,280.00 in wages and penalties from Mr. Wang.

**E.     Attorney's Fees**

23.     Mr. Johnson asserts that he is entitled to recover his attorney's fees.  (*See* Johnson Br. at 4.)  "The equitable grant of attorney's fees is appropriate in admiralty only when the shipowner acted arbitrarily, recalcitrantly, or unreasonably." *Madeja v. Olympic Packers, LLC.*, 310 F.3d 628, 635 (9th Cir. 2002); *see Flores v. Am. Seafoods Co.*, 335 F.3d 904, 919 (9th Cir. 2003) ("Under federal maritime law, no attorneys' fees may be awarded in this case, where the district court explicitly held that ASC had acted in good faith.").  The district court has discretion to award "punitive attorney fees" when a shipowner is "intentionally dishonest or recalcitrant either in refusing to pay [a seaman's] wage claims or in defending against these claims." *Madeja*, 310 F.3d at 636.

24.     After agreeing to pay Mr. Johnson $15.00/hour to prepare the F/V Thor for the 2016 fishing season (8/13/18 Tr. Trans. at 11:9-18), Mr. Wang then denied that he had ever hired Mr. Johnson to work on the F/V Thor (Wang Dep. at 21:24-7).  Mr. Wang also told Mr. Johnson that he was "dead wood, an old man," and that Mr. Johnson would be "dead before [Mr. Wang] paid him a dime." (*Id.* at 25:7-11.)  Based on this conduct, the court concludes that Mr. Wang was intentionally dishonest, recalcitrant, and acted in bad faith when he refused to pay Mr. Johnson his wages for preparing the F/V Thor for the 2016 tuna fishing season.  On this basis, Mr. Johnson is entitled to recover his

//

attorney's fees in prosecuting his complaint against Mr. Wang. *See Madeja*, 310 F.3d at 636.

25.     In its order denying Mr. Johnson's motion for summary judgment, the court noted various inconsistencies in Mr. Wang's pretrial testimony. *Johnson*, 2017 WL 4957709, at \*5 ("The court is mindful of the inconsistencies in Mr. Wang's testimony."). In this order, the court also describes the various inconsistencies in Mr. Wang's trial testimony and finds his trial testimony to be not credible. *See supra* § II.B.9. Indeed, the court warned Mr. Wang during the course of his trial testimony about the inconsistencies in his testimony. (8/14/18 Tr. Trans. at 165:22-166:6.) Based on this conduct, the court concludes that Mr. Wang was intentionally dishonest in defending against Mr. Johnson's claims. Mr. Wang's bad faith litigation conduct is an independent basis on which Mr. Johnson is entitled to recover his attorney's fees in prosecuting his complaint. *See Madeja*, 310 F.3d at 636.

26.     The court orders Mr. Johnson's counsel to file a motion, along with appropriate evidentiary materials, within 14 days of the date of this order so that the court may determine the appropriate amount of Mr. Johnson's reasonable attorney's fees. The court further orders Mr. Johnson's counsel to note the motion in accordance with Local Rule LCR 7(d) so that Mr. Wang has the opportunity to file a timely response. *See* Local Rules W.D. Wash. LCR 7(d). The court will enter judgment following its determination of the amount of Mr. Johnson's reasonable attorney's fees.

//

//

**F.     Prejudgment Interest**

27.     Mr. Johnson asks for an award of prejudgment interest.  (Compl. at 2; Johnson Br. at 5.)  The award of prejudgment interest in maritime cases "is the rule, rather than the exception." *Corpus Christi Oil & Gas Co. v. Zapata Gulf Marine Corp.*, 71 F.3d 198, 204 (5th Cir. 1995).  Indeed, the trial court has discretion to deny prejudgment interest "only where peculiar circumstances would make such an award inequitable." *Id.*  The court finds no such peculiar circumstances exist in this case.

28.     When determining the appropriate amount of pre-judgment interest to apply, admiralty courts "may look to state law and other reasonable guideposts." *Todd Shipyard Corp. v. Auto Transp., S.A.*, 763 F.2d 745, 753 (5th Cir. 1985).  Under Washington law, "it is a proper exercise of discretion for a trial court to calculate prejudgment interest in a civil dispute at the statutory judgment interest rate reflected in RCW 4.56.110." *Pub. Util. Dist. No. 2 of Pac. Cty. v. Comcast of Wash. IV, Inc.*, 184 Wash. App. 24, 81, 336 P.3d 65, 94 (Wash. Ct. App. 2014), *as amended on reconsideration* (Feb. 10, 2015).  "Twelve percent is within the permissible range of interest rates pursuant to RCW 4.56.110(4)." *Id.* (citing RCW 19.52.020).

29.     The court awards prejudgment interest only on $22,140.00—the portion of the judgment that constitutes Mr. Johnson's unpaid wages—and not the doubled portion of Mr. Johnson's award.  *See Paul v. All Alaskan Seafoods, Inc.*, 24 P.3d 447, 459 (Wash. Ct. App. 2001) ("Prejudgment interest was awarded on damages arising under the fishermen's maritime claim, not on the double wage award under state law.").

//

30.     The court concludes that pre-judgment interest at the rate of 12.00% per year is appropriate.  In this case, prejudgment interest accrues at a rate of $7.28/day (22,140 x .12 ÷ 365).  The pre-judgment interest rate shall apply from September 2, 2016, which is the last day that Mr. Johnson worked for Mr. Wang and the day on which Mr. Wang agreed to pay Mr. Johnson his wages, until the current date, for a total of 740 days. Accordingly, the court concludes that Mr. Johnson is entitled to an award of prejudgment interest in the amount of $5,387.20.

## IV.     CONCLUSION

On the basis of the foregoing findings of fact and conclusions of law, the court concludes that Mr. Johnson is entitled to recover from Mr. Wang, *in personam*, and the F/V Thor, *in rem*, jointly and severally:

1.     Wages in the amount of $22,140.00 pursuant to 46 U.S.C. §§ 10601 and 11107.  *See supra* § III.C.  In addition, under RCW 49.52.070, Mr. Johnson is entitled to double this amount for a total of $44,280.00 in wages and penalties.  *See supra* § III.D.

2.     Reasonable attorney's fees in an amount to be determined by the court after Mr. Johnson's attorney files an appropriate motion as described herein.  *See supra* § III.E.

3.     Prejudgment interest on his $22,140.00 of unpaid wages in the amount of $5,387.20.  *See supra* § III.F.

//

//

//

//

1       The court will reserve its entry of judgment until after it determines the amount of

2    Mr. Johnson's reasonable attorney's fees.

3       **IT IS SO ORDERED**.

4       Dated this 12th day of September, 2018.

5

6    _____

7    JAMES L. ROBART
     United States District Judge

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22